**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JULI WINTJEN, on behalf of herself and** **all other similarly situated,** | ) | **2:19-CV-00069-NR** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **DENNY'S INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND DISMISSAL PURSUANT TO 28 U.S.C. § 1367**

## I.    INTRODUCTION

Plaintiff Juli Wintjen brings this action against Defendant's Denny's, Inc. under the Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and the Pennsylvania Minimum Wage Act ("PMWA"), 42 P.S. § 333.102 *et seq.*, alleging: (1) that Denny's failed to provide her with the required notice of its intention to claim a tip-credit in violation of 29 U.S.C. § 203(m); and (2) that Denny's failed to compensate her at the full minimum wage for certain hours she claims she was employed in a non-tipped "dual job." She asserts her FLSA and PMWA claims on behalf of a purported class of tipped employees who worked for Denny's in Pennsylvania. Denny's now moves for partial summary judgment on Ms. Wintjen's FLSA claims under Federal Rule of Civil Procedure 56, and seeks dismissal, without prejudice, of Ms. Wintjen's state law claims under the PMWA pursuant to 28 U.S.C. § 1367.[1]

---

[1] Ms. Wintjen has not yet moved for conditional certification of her FLSA claims as a collective action, or for Fed. R. Civ. P. 23 class certification of her PMWA claims. Denny's reserves the right to object to any attempt by Ms. Wintjen to seek judgment on her PMWA claims prior to a determination of class certification based on the rule against one-way intervention. *See Koehler v. USAA Casualty Insurance Co.*, No. 19-715, 2019 WL 4447623 (E.D. Pa. Sept. 17, 2019).

The Court should dismiss Ms. Wintjen's FLSA claims. With respect to Ms. Wintjen's FLSA tip-credit claim, Ms. Wintjen's deposition testimony establishes that she has not suffered a concrete injury-in-fact, and thus, lacks standing under Article III of the United States Constitution to pursue this claim. Moreover, the undisputed evidence establishes that Denny's nevertheless provided Ms. Wintjen with the information necessary to satisfy its obligations under 29 U.S.C. § 203(m).

With respect to Ms. Wintjen's FLSA "dual jobs" claims, Ms. Wintjen cannot establish when or how much time she spent performing non-tip generating work for which she alleges she should have been paid full minimum wage. Because her estimate on the amount of time she spent on "non-tip generating work" constitutes pure speculation, she cannot meet her burden to show that a genuine issue of material fact necessitating a jury trial exists.

Because the Court should dismiss Ms. Wintjen's FLSA claims, the Court should also dismiss, without prejudice, her PMWA claims pursuant to 28 U.S.C. § 1367. These claims raise novel issues of state law that are more properly addressed in the first instance by a Pennsylvania state court.

II.     **BACKGROUND**

A.     <u>**Statement of Facts**</u>

1.      Defendant Denny's owns and operates a chain of restaurants located across the United States, including in the Commonwealth of Pennsylvania. (Compl. (Doc. 1) ¶¶18-19; Answer (Doc. 14) ¶¶ 18-19.)

2.      Plaintiff Juli Wintjen began working for Denny's as a server in September 2017. (Juli Wintjen Dep. ("Wintjen Dep.") 92:1-8, 122:25-123:8, Ex. 9, Jan. 30, 2020.)

3.      Prior to starting work for Denny's, Ms. Wintjen had worked as a food server for Aldo's Pizzeria, Pizza Hut, and a Denny's franchisee named Know-Betta Breakfast ("Know-Betta"). (*Id.*at 65:9-13, 67:8-21, 70:17-71:1.)

4.      At both Pizza Hut and Know-Betta she received sub-minimum wage plus tips, and understood that was how she was being compensated. (*Id.*at 65:18-66:21, 71:9-13.) Ms. Wintjen further acknowledged that she understood that servers were generally compensated by sub-minimum wage plus tips, because her mother had been a server all of Ms. Wintjen's life. (*Id.* at 66:2-14.)

5.      Ms. Wintjen applied for the server position with Denny's at the Cranberry Township, Pennsylvania location on August 19, 2017. (Jessica Brown Dec., ¶ 6, Ex. A at DENNY'S000017.)

6.      In her application, Ms. Wintjen described the duties she had in her prior position as a server with Know-Betta as "Greet guest, seat guest, grab drinks, take orders, run register, take phone orders, run food, sidework, give discounts, 'run' shifts, pull drawers, check sidework, tip out." (*Id.* at DENNY'S000015.)

7.      Ms. Wintjen interviewed with three different managers, Madeleine Weinel (née Lucas), John Griffiths, and Brian Krah. (Wintjen Dep. 96:3-98:99:1.)

8.      During Ms. Wintjen's third interview with Brian Krah, he offered her a job, and she accepted. (*Id.* at 99:7-11.)

9.      Ms. Wintjen testified that she "was sure" that she understood how she would be paid at Denny's before she accepted Mr. Krah's job offer, and that she would be making "$2.83 plus tips." (*Id.* at 99:16-100:1.)

10.     Ms. Wintjen started work as a server on September 12, 2017. (Wintjen Dep. 166:25-167:11.)

11.     Consistent with Denny's' practices, Ms. Wintjen was assigned three job codes: 25 - Training; 05 - Server; and 60 - Meeting. (Deposition of Denny's, Inc. (Brian Hart) ("Hart Dep") 245:10-246:7, Ex. 42; Brown Dec., ¶ 7, Ex. B.) Ms. Wintjen was paid for time recorded under the "Training" and "Meeting" codes at the federal minimum wage of $7.25 per hour, whereas she was paid for time recorded under the "Server" code at the Pennsylvania tipped employee minimum wage of $2.83 per hour. (Brown Dec., ¶ 7, Ex. B; Wintjen Dep., Ex. 9.)

12.     Prior to beginning work, Ms. Wintjen went through the onboarding process with restaurant manager Madeleine Weinel. (Wintjen Dep. 104:105:2.)

13.     Ms. Weinel provided Ms. Wintjen with a folder, which contained Denny's' Employee Handbook. (*Id.* at 104:16-105:2.)

14.     Ms. Weinel also went through a "[s]tack of paperwork" with Ms. Wintjen, and told her that the "handbook" was in the folder, and that she should read it. (*Id.* at 106:14-18.)

15.     Ms. Wintjen also testified that she had no recollection of the specific information Ms. Weinel conveyed to her during the onboarding process. (*Id.* at 106:19-107:12.)

16.     Ms. Weinel has testified that she went through the following information with Ms. Wintjen:

        a.     that Denny's, Inc. utilized a tip credit for food servers in Pennsylvania;

        b.     the difference between the federal minimum wage and the Pennsylvania tip credit minimum wage;

4

      c.      that if Ms. Wintjen did not receive enough in tips to meet the minimum wage for a payroll period, an adjustment would be made to his or her hourly rate of pay to meet the federal minimum wage; and

      d.      that Denny's did not participate in tip pooling arrangements, and that tipped employees should retain all tips received.

(Madeleine Weinel Declaration ("Weinel Dec."), at ¶¶ 7, 14.)

17.     Ms. Weinel further attests that she took Ms. Wintjen on a "safety tour," and showed her the Pennsylvania and federal labor law posters posted in the breakroom at the Cranberry Township location. (*Id.* at ¶ 15; Hart Dep., Exs. 13 & 40.)

18.     At the completion of the onboarding process, she signed an onboarding checklist, which has an entry for "Tip Credit Information (where applicable)." (Weinel Dec., at ¶ 16, Ex. B.)

19.     Additionally, both Ms. Wintjen and Ms. Weinel acknowledged that Ms. Wintjen had reviewed the "Tip reporting requirements" during the onboarding process. (*Id.* at ¶ 18, Ex. D at DENNY'S000009.)

20.     Ms. Weinel further attested that she provided Ms. Wintjen with copies of the current Denny's "Employee Guidebook" and the "Wage and Hour Acknowledgment," and that she reviewed those with Ms. Wintjen. (*Id.* at ¶ 17, Exs. C & D.)

21.     Ms. Wintjen also electronically acknowledged that she had read and was responsible for the contents of the following documents, among others, through Denny's "Workday" system:

      a.      "In-Unit Employee Guidebook";

      b.      "In-Unit Hourly Acknowledgments"; and

      c.      "Code of Conduct."

5

(Brown Dec. at ¶ 9, Ex. D at DENNY'S000032.)

22.     Ms. Wintjen testified, however, that she had falsely represented to Denny's that she had read the employee guidebook. (Wintjen Dep. 138:10-24, 145:23-146:2.)

23.     The Employee Guidebook contains the following disclosures:

> Your work week runs from Thursday through Wednesday with paydays occurring biweekly.
>
> . . .
>
> Denny's is committed to following all federal, state, and local laws and regulations regarding wage and hour compliance. It's extremely important that you understand and adhere to applicable governing laws in your area as well as any Denny's internal policies that address wage and hour issues. These laws and our policies cover, but are not limited to, such critical areas as proper payment of wages, what time is to be compensated, meal and rest periods, payment of minimum wage and overtime, recordkeeping, and the hours and duties of minors.
>
> . . .
>
> If you have questions about these topics or any other wage and hour issues, or if you have a reasonable belief that our policies or the laws are not being adhered to in your unit, you should promptly contact a member of your management team and/or Human Resources.
>
> **TIME RECORDS**
> All records reflecting the amount of hours worked by our employees must be accurate. Employees are required to properly clock in and out for all shifts and unpaid breaks.
>
> . . .
>
> **TIPPED EMPLOYEE**S
> Under federal law, and in many states, employers may pay tipped employees an hourly rate less than the minimum wage and then claim a wage credit for tips received by eligible employees. This is called a "tip credit."
>
> Denny's does not participate in tip pooling arrangements and tipped employees should retain all tips received . . .

(Weinel Dec., ¶ 17, Ex. C.)

24.     The "Important Wage and Hour Policies Summary and Acknowledgment Form" ("Wage & Hour Acknowledgment") contains the following disclosures:

**<u>Accurate Time Records</u>**

Records reflecting hours worked by hourly employees, including hours and position worked, must be accurate. Hourly employees are responsible for properly clocking in and out at the beginning and end of shifts as well as for breaks. Management must not alter, falsify, or tamper with time records for any reason.

. . .

**Tip Reporting**
Employees are required to accurately report all tipped income. Employees who fail to report tips or who consistently under-report tips will be counseled accordingly. If an employee in a tip credit state actually does not receive enough in tips to meet the minimum wage for the payroll period, an adjustment will be made to their hourly rate.

(Weinel Dec., ¶ 17, Ex. D.)

25.    Ms. Wintjen was ultimately terminated from employment for job abandonment on November 30, 2017. (Brown Dec., ¶ 9, Ex. D at DENNY'S000036.)

26.    During Ms. Wintjen's nine weeks of employment with Denny's, she never received less than minimum wage during a workweek (Wednesday through Thursday) while working under the "05 – Server" job code, when factoring the tips she received. Her adjusted wage by work week, when accounting for tips, was as follows:

| Work Week | Hours Worked (05 – Server) | Wages Paid | Tips Reported | Effective Wage |
|---|---|---|---|---|
| 9/18/17-9/20/17 | 20.666665 | $71.77 | $118.98 | $9.23 |
| 9/21/17-9/27/17 | 32.183332 | $91.08 | $190.46 | $8.75 |
| 9/28/17-10/4/17 | 34.433332 | $97.45 | $292.55 | $11.32 |
| 10/5/17-10/11/17 | 32.966664 | $93.30 | $349.50 | $13.43 |
| 10/12/17-10/18/17 | 46.299998 | $153.90 | $411.85 | $12.22 |
| 10/19/17-10/25/17 | 28.266665 | $80.00 | $160.10 | $8.49 |
| 10/26/17-11/1/17 | 39.416664 | $111.55 | $310.82 | $10.72 |
| 11/2/17-11/8/17 | 36.249998 | $102.59 | $234.60 | $9.30 |
| 11/9/17-11/15/17 | 24.933333 | $70.56 | $227.43 | $11.95[2] |

(*Id.* at ¶ 8, Ex. C; Wintjen Dep., Ex. 9.)

---

[2] Ms. Wintjen reported $22.72 in tips while working under a minimum wage job code on November 12 and 13, 2017. To the extent Ms. Wintjen argues those tips should be removed in calculating her effective wage, an interpretation with which Denny's does not agree, her effective wage becomes $11.04 per hour.

27.     Ms. Wintjen testified that as part of her job responsibilities at Denny's, she performed a number of non-tip generating tasks. (Wintjen Dep. 57:15-58:1.) Specifically, she testified:

> Q.     What do you consider to be non-tipped [sic] generating work, in your view?
>
> A.     Any bit of side work that they ask you to do, as far as stocking, prepping, refilling stuff, changing our inserts, running the register, mopping, sweeping, rolling silverware, whatever they ask you to do that day.

(*Id.* at 57:20-58:1.)

28.     She further testified that she considered such work to be "part of the duties of a food server" from her experience. (*Id.* at 58:2-8.)

29.     She also testified that she was asked to wash dishes at the Cranberry Township location on two occasions, but was only able to offer an estimate as to how much time she spent for the second time, which she testified was "about a half hour, 45 minutes." (*Id.* at 60:6-61:6.) With respect to the details of these incidents, Ms. Wintjen testified:

> Q.     What time of day was it when you were doing dishes?
>
> A.     That was definitely nighttime.
>
> Q.     Like, before midnight, after midnight?
>
> A.     Probably around midnight, maybe a little before, maybe a little after. I'm unsure.
>
> Q.     Do you remember the day of the week when that happened?
>
> A.     No.
>
> Q.     Do you remember the month?
>
> A.     No.

(*Id.* at 61:20-62:5.)

30.     Ms. Wintjen's time records indicate that she worked under a minimum wage job code during evening hours on the following dates:

      a.      On September 14, 2017 between 5:12 p.m. and 11:24 p.m. (6.2 hours);

      b.      On September 15 and 16, 2017 between 4:55 p.m. and 3:28 a.m. (10.55 hours);

      c.      On September 16 and 17, 2017 between 7:58 p.m. and 3:02 a.m. (7.067 hours);

      d.      On October 22 and 23, 2017 between 10:27 p.m. and 12:14 a.m. (1.78 hours);

      e.      On November 12 and 13, 2017 between 4:34 p.m. and 12:14 a.m. (7.67 hours).

(Brown Dec. at ¶ 8, Ex. C.)

31.     With respect to the amount of time Ms. Wintjen claims that "[a]ny time [she] did side work, it took [her] at least an hour to two hours." (Wintjen Dep. 132:24-25.) When asked for additional detail, she testified:

Q.     . . . Is it accurate to say that as you sit here today, you are unable to tell me whether you worked on a particular day, whether the hours that you – what the hours were that you worked on that particular day, and how much side work you performed on a particular day?

A.     Yes.

Q.     You cannot tell me that?

A.     I cannot.

Q.     So in terms of your claims in this case, you have alleged that you spent more than 30 percent of your time, on any given shift, on what you deemed unrelated tasks or side work; correct?

A.     Correct.

Q.     So how did you arrive at the 30 percent if you, sitting here today, cannot tell me how much on a particular shift you spent on side work or unrelated tasks?

A.     Because I spent a lot of my life – not a lot of my life. But I spent a lot of time serving, and I know how long my side work would take me night to night.

> I can't tell you what days it took and how long it took, but I can tell you that generally it would take anywhere from an hour to two hours, sometimes more, especially on midnights.

(*Id.* at 170:21-171:21.)

32.     Ms. Wintjen's estimate of how much time she spent on side work or unrelated tasks was not, however, based solely on her 9 weeks of employment at Denny's, but instead on her several years of employment by Know-Betta, a Denny's franchisee:

> Q.     . . . So when you say based on your experience you are including in that work that you performed at Know-Betta; correct?
>
> A.     Correct.
>
> . . .
>
> Q.     And you were at Denny's, Inc. for a little over two months, correct?
>
> A.     I'm basing it off of my experience in both places, not just in Know-Betta. I don't want you to misinterpret that.
>
> I'm basing it off of both experiences. It took an hour to two hours to do my side work every night, at least.

(*Id.* at 172:2-22.)

33.     Ms. Wintjen worked a total of 38 shifts over her nine weeks of employment under the "05 – Server" job code, for a total of 295.416651 hours. Applying her estimate of one to two hours of side work per shift, the percentage of time she spent performing such tasks was between 12.86% and 25.73% of her time at Denny's.

###     B.     Procedural History

Ms. Wintjen filed her lawsuit against Denny's on January 22, 2019 on behalf of herself and "'Tipped Employees' who work or have worked at restaurants operating under the trade name Denny's that are owned and operated and/or managed by Defendant Denny's Corporation .

. . and have been subject to the unlawful practices detailed [in the Complaint]." (Doc. 1 ("Compl."), ¶ 1.)[3] Ms. Wintjen asserts three claims.

First, Ms. Wintjen alleges that Denny's violated the FLSA by allegedly: (1) failing "to inform Plaintiff of (i) their intention to take the tip credit, and (ii) the amount [Denny's] intended to claim as a tip credit" (Compl., ¶ 59); and (2) by failing "to pay Plaintiff minimum wage for non-tip generating side work" that "comprised a substantial portion of [Ms. Wintjen's] shifts" (Compl., ¶¶ 65-67).

Second, Ms. Wintjen alleges that Denny's violated the PMWA by allegedly: (1) failing "to comply with 43 P.S. 231.34 insofar as it failed to notify employees in writing whenever the tip credit claimed by Defendant changed"; (2) failing to "comply with 43 P.S. 231.34 insofar as it failed to notify employees in writing of the hours worked where the Tipped Employee did not receive tips" (Compl. ¶ 63); and (3) failing to "record the hours where Plaintiff . . . were engaged in non-tip generating work," which Ms. Wintjen claims is a violation of 43 P.S. 231.34 (Compl., ¶ 69). Ms. Wintjen further alleges that Denny's alleged violations were "willful" within the meaning of 29 U.S.C. § 255(a) and the PMWA. (Compl., ¶ 79.)

Denny's now moves for partial summary judgment on Ms. Wintjen's FLSA claims, and to dismiss the state law claims, without prejudice, pursuant to 28 U.S.C. § 1367.

## III.    ARGUMENT

Denny's is entitled to summary judgment on Ms. Wintjen's FLSA claims, and her related state law claims should be dismissed pursuant to 28 U.S.C. § 1367. "Summary judgment will be proper 'if the pleadings, depositions, answers to interrogatories . . . show that there is no genuine issue of as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[3] Ms. Wintjen further limits the scope of the class to "[a]ll current former Tipped Employees who have worked for Defendant in the Commonwealth of Pennsylvania . . ." (Compl., ¶¶ 10-11.)

law.'" *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 184 (3d Cir. 2014). "When an employee brings a claim under the FLSA, he ordinarily bears 'the burden of proving that he performed work for which he was not properly compensated.'" *Id.* at 188. Accordingly, summary judgment on FLSA claims in favor of the employer is appropriate if the plaintiff has "failed to produce sufficient evidence of missed overtime pay." *Id.* In this case, Ms. Wintjen has not produced sufficient evidence in support of any of her FLSA claims.

A.   **Ms. Wintjen Lacks Article III Standing to Pursue Her FLSA Tip-Credit Claims**

As a preliminary matter, Ms. Wintjen lacks standing under Article III of the United States Constitution to bring her claim that Denny's failed to properly notify her of its intention to take a "tip credit" in accordance with 29 U.S.C. § 203(m).

To establish Article III standing, "a 'plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Kamal v. J. Crew Group, Inc.*, 918 F.3d 102, 110 (3d Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016)). To establish the first element, a plaintiff must show "an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical." *Kamal*¸ 918 F.3d at 110 (internal quotations omitted).

As the Third Circuit has explained:

A concrete injury is '*de facto*;' it "actually exist[s]," though it need not be "tangible." "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles."

. . .

While Congress "may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate at law,'" standing "requires a concrete injury even in the context of a statutory violation[.]"

Therefore, a "bare procedural violation, divorced from any concrete harm," cannot "satisfy the injury-in-fact requirement of Article III . . ."

*Long v. Southeastern Penn. Trans. Auth.*, 903 F.3d 312, 321 (3d Cir. 2018) (internal citations omitted) (quoting *Spokeo*, 136 S.Ct. at 1548-49 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992))).

In *Long*, the Third Circuit assessed a class action brought by plaintiffs alleging that the Southeastern Pennsylvania Transportation Authority ("SEPTA") had violated the Fair Credit Reporting Act (FCRA), and specifically 15 U.S.C. § 1681b(b)(3)(A). Under that provision, before a potential employer takes an adverse action on a consumer report, it "'shall provide' the person who is the subject of the report with '(i) a copy of the report; and (ii) a description in writing of the rights of the consumer under [the FCRA].'" *Long*, 903 F.3d at 317-18 (quoting 15 U.S.C. § 1681b(b)(3)(A)). Among other violations, the plaintiff alleged that SEPTA had violated the FCRA by its "alleged failure to notify Plaintiffs of their FCRA rights." *Id.* at 325.

Although the Third Circuit held that the plaintiff had sufficiently alleged facts to support standing for other violations, it found he had failed to do so for this claim. *Id.* The plaintiffs argued that the notice failure was a sufficiently "concrete harm" because the statutory violation "increased the risk that individuals would not know of their FCRA rights and have their claims lapse before they could bring suit." *Id.* at 325 (internal quotations and original formatting omitted).

The Third Circuit rejected the plaintiffs' argument, finding that this amounted to a "'bare procedural violation, divorced from any concrete harm,' that cannot 'satisfy the injury-in-fact requirement of Article III.'" *Id.* (quoting *Spokeo*, 136 S.Ct. at 1549). This was so because the plaintiffs became aware of their FCRA rights and were able to file this lawsuit within the prescribed limitations period, so they were not injured." *Id.* at 325 (emphasis added). The *Long*

court also relied upon the fact that "although [the plaintiffs] did not receive FCRA rights disclosures, *they understood their rights sufficiently to be able to bring this lawsuit*." *Id.* (emphasis added).

In reaching this holding, the Third Circuit relied on the Seventh Circuit's decision in *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884 (7th Cir. 2017), in which that court reached the same conclusion. In distinguishing cases in which the Supreme Court had found an "informational injury" to be sufficient to confer standing, the court explained that the plaintiff in that case was "not seeking to compel [the defendants] to provide him with information" or that "after realizing he was provided with a non-compliant disclosure, he required that [the defendants] provide him with a compliant disclosure and was denied." *Id.* at 888. The court also based its decision on the fact that the statute did not seek to protect the plaintiff from "receipt of a non-compliant disclosure," but to "decrease the risk that a job applicant would unknowingly consent to allowing a prospective employer to procure a consumer report." *Id.*

Ms. Wintjen bears the burden of establishing that she has Article III standing to pursue each of her claims. *Long*, 903 F.3d at 323 ("A plaintiff must demonstrate standing for each claim he seeks to press." (internal quotations omitted)). Where standing is raised on summary judgment, a plaintiff must establish the requisite elements through declarations or other evidence that standing exists. *See Lujan*, 504 U.S. at 563 (holding that to survive government motion for summary judgment, plaintiff had to "submit affidavits or other evidence showing, through specific facts" that they met the standing requirements to pursue their claims).

In this case, Ms. Wintjen lacks Article III standing to pursue her claim that Denny's tip-credit notice was sufficient as she not suffered any concrete injury fairly traceable to the alleged

deficient notice. The FLSA's notice requirement stems from 29 U.S.C. § 203(m), which provides:

> The [tip credit] shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Ms. Wintjen's testimony conclusively establishes that she understood, prior to starting work for Denny's, that she would be making less than the minimum wage as a server, plus tips. (Wintjen Dep. 66:25-67:5, 71:9-16, 90:17-19, 102:18-103:13.) Further, Ms. Wintjen's time records establish that at no time did she ever earn less than the minimum wage during her nine weeks of employment with Denny's, Inc. when adding tips, and she does not allege otherwise in her Complaint. (Brown Dec. at ¶ 8, Ex. C.) Ms. Wintjen also testified that she did not participate in a tip-pooling arrangement at the Cranberry Township, and that she was never compelled to share any portion of the tips she received. (Wintjen Dep. 142:15-143:2.) Thus, she has not suffered an injury in fact sufficient to confer Article III standing.

Like the FCRA notice statute addressed in *Long* and *Groshek*, the harm that § 203(m) seeks to prevent is not an employee's "receipt of a non-compliant disclosure," but the harm that may result from an employee accepting a compensation arrangement she might not otherwise accept if provided with the information the statute requires. *See Groshek*, 865 F.3d at 888 ("Congress did not enact § 1681b(b)(2)(A)(i) to protect job applicants from disclosures that do not satisfy the requirements of that section; it did so to decrease the risk that a job applicant would unknowingly consent to allowing a prospective employer to procure a consumer report."). Here, Ms. Wintjen was fully aware of what her compensation would be when she began working at Denny's, and did not suffer any harm the statute exists to prevent: she knew she would be

15

earning a sub-minimum wage of $2.83 plus tips; always made more than minimum wage during a given work week when including tips; and was allowed to retain all of her tips.

Further, like the plaintiff in *Groshek*, Ms. Wintjen is not seeking to compel Denny's to provide her with a compliant disclosure, nor has she alleged that after realizing she received a non-compliant disclosure, she requested that Denny's provide her with one. 865 F.3d at 888. She has thus alleged a mere "informational injury" of the kind insufficient to establish Article III standing. *Id.* Indeed, she seeks nothing more than a windfall in this case, based solely on the allegation of a bare procedural violation (which, as discussed below, did not occur in any event).

Accordingly, as no genuine issue of material fact exists regarding Ms. Wintjen's Article III standing to pursue her tip-credit notice claim, the Court must dismiss for lack of subject matter jurisdiction.

**B.    Ms. Wintjen's FLSA Claims Fail as a Matter of Law**

*1.    Denny's Complied With The FLSA's Tip-Credit Notice Requirements*

Ms. Wintjen alleges in her Complaint that Denny's failed to comply with the tip-credit notice requirements of 29 U.S.C. § 203(m) by failing to inform her of: "(i) their [sic] intention to take the tip credit, and (ii) the amount Defendant intended to claim as a tip credit." (Compl., ¶ 59.) Ms. Wintjen does not allege that Denny's failed to disclose any other information required under § 203(m).

To satisfy its notice obligations under § 203(m), an employer may provide oral or written notice of the information required by the statute. *See Calabrese v. TGI Friday's Inc.*, No. 16-cv-0868, 2017 WL 5010030, at *5 (E.D. Pa. Nov. 2, 2017) (granting summary judgment to employer on FLSA tip-credit claim based on oral communication by new hire's training manager). *See also Nat'l Rest. Ass'n v. Solis,* 870 F. Supp.2d 42, 58 (D.D.C. 2012) (noting that DOL had rejected calls for tip-credit regulation, 29 C.F.R. § 531.59, to include a requirement

that notice be in writing). The burden is on the employer to show that the disclosures were made. *See Reich v. Chez Robert, Inc.*, 28 F.3d 401, 403 (3d Cir. 1994).

Section 203(m) does not require the employer to provide the required disclosures in any specific form; rather, the question is whether the employer provided sufficient notice to the employee. *See Schaefer v. Walker Bros. Enters.,* 829 F.3d 551, 558 (7th Cir. 2016) (holding that employee handbook and poster combined to supply workers with the pieces necessary to comply with tip-credit notice requirement); *McDougle v. Dakota of Rocky Hill, LLC*, No. 3:17-cv-00245, 2019 WL 4791446, at *6 (D. Conn. Dept. 30, 2019) (concluding on a motion for class certification that a restaurant-employer's "orientation process, internal policies, and wage posters collectively notified its servers of the give tip credit provisions"); *Calabrese*, 2017 WL 5010030, at *5 (granting summary judgment to employer on tip-credit claim based on a combination of information provided to the employee in the form of discussions with his managers during the interview process; computerized training; employee handbook review; and labor law posters). As one district court has explained, "employers do not have to explain the tip credit to employees . . . it is enough to inform them of it." *Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285, 1293 (N.D. Ga. 2014), *aff'd*, 667 F. App'x 746 (11th Cir. 2016)).

As an initial matter, the onboarding checklist, signed by Ms. Wintjen, establishes that it was Denny's prescribed policy and procedure to inform all new employees of "Tip Credit Information (where applicable)." (Wintjen Dep., Ex. 6.) Madeleine Weinel, who onboarded Ms. Wintjen, also testified that it was her practice to provide the required information. (Weinel Dec., ¶¶ 6-7.)

      a.    <u>Denny's informed Ms. Wintjen that it intended to utilize the tip-credit.</u>

In this case, Denny's sufficiently notified Ms. Wintjen of its intention to use a tip-credit, and Ms. Wintjen understood that Denny's intended to do so. First, as Ms. Wintjen herself testified, Denny's manager Brian Krah told Ms. Wintjen at the time of her hire that she would be paid $2.83 plus tips. (Wintjen Dep. 90:13-91:1.) Ms. Wintjen also understood that she was being paid the federal minimum wage for time she spent in training. (Wintjen Dep. 124:21-24 (". . . any time I filled out paperwork, [Denny's] paid me for minimum wage").) Additionally, Denny's manager Madeleine Weinel attested that she informed Ms. Wintjen of the fact that Denny's intended to take a tip credit while onboarding Ms. Wintjen. (Weinel Dec., ¶¶ 7, 14.)

Denny's further disclosed its intention to take the tip credit in the Employee Handbook Ms. Wintjen acknowledged receiving. (Wintjen Dep. 135:13-17 ("I'm certain that I received an employee handbook").) The handbook states that "[u]nder federal law, and in many states, employers may pay tipped employees an hourly rate less than the minimum wage and then claim a wage credit for tips received by eligible employees. This is called a 'tip credit.'" (Weinel Dec., Ex. C.) And the Wage & Hour Acknowledgment Ms. Wintjen received further discloses this intention, providing: "If an employee in a tip credit state actually does not receive enough in tips to meet the minimum wage for the payroll period, an adjustment will be made to their hourly rate." (*Id.* at Ex. D.) Ms. Wintjen, for her part, testified that she could not remember what information she received during onboarding, other than the Employee Handbook. (Wintjen Dep. 106:19-107:12.)

The volume of information Ms. Wintjen received informing her that Denny's intended to utilize the tip-credit with respect to the wage it intended to pay her as a server conclusively establishes that Denny's satisfied this requirement of the statute. *See Calabrese*, 2017 WL 5010030, at *5 (finding that employer satisfied this requirement by informing servers "both

verbally and in writing that they would be paid an hourly rate which was less than the mandated minimum wage because they received tips (provided that they received tips in a sufficient amount to cover the tip credit), what the amount of their cash wages would be and the amount of the tip credit").

> b.   Denny's informed Ms. Wintjen of the amount Denny's intended to claim as a tip-credit.

Denny's also informed Ms. Wintjen of the amount it intended to claim as a tip-credit. Ms. Wintjen testified that she was informed that she would receive a cash wage of $2.83 per hour. The Pennsylvania minimum wage in 2017 was $7.25 per hour, the same as the federal minimum wage. Thus, the maximum amount Denny's could have claimed was $4.42 per hour.

Madeleine Weinel further attests that she informed Ms. Wintjen of this information during her onboarding. (Weinel Dec., ¶¶ 7, 11, 14, 15) Ms. Weinel attests that she showed Ms. Weinel the Pennsylvania and federal labor law posters posted in the breakroom, which disclosed the minimum wage. (Weinel Dec., ¶¶ 7, 11, 14, 15; Hart Dep. 167:23-168:18, 237:8-238:20, Exs. 13 & 40.) Likewise, Denny's disclosed the minimum wage and tip credit wages Ms. Wintjen was receiving on her first pay stub she received from Denny's. (Wintjen Dep., Ex. 9.)

Ms. Wintjen, when asked, could not recall what information Ms. Weinel provided to her during onboarding, or whether Ms. Weinel showed her the labor law posters. Ms. Wintjen is therefore unable to rebut this testimony. (Wintjen Dep. 106:19-107:12, 156:11-17.) Accordingly, as no genuine issue of material fact exists regarding Denny's compliance in disclosing the two pieces of information Ms. Wintjen alleges Denny's failed to disclose under § 203(m), Denny's is entitled to summary judgment on this claim.

> 2.   *Ms. Wintjen Cannot Establish That She Was Engaged In A Dual Job While Employed at Denny's*

Denny's is also entitled to summary judgment on Ms. Wintjen's "dual jobs" claim. To constitute a "tipped employee" within the meaning of 29 U.S.C. § 203(m), an employee must be "engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). Under the Department of Labor's so-called "dual jobs" regulation, an employer may not take the tip credit for hours worked by that employee in a second job with the same employer if that job would not qualify the employee as a "tipped employee" under § 203(t). 29 C.F.R. § 531.56(e).

In this case, Ms. Wintjen claims that she was not a "tipped employee" when she performed various "non-tip generating work" because such non-tip generating work "comprised a substantial portion" of her shift. (Compl., ¶¶ 64-65.) Specifically, Ms. Wintjen alleges that she spent "approximately 30% of each of her shifts performing side work," i.e., "non-tip generating work." (Compl., ¶¶ 64, 66.) Ms. Wintjen bears the burden of establishing that she performed work for which she was not properly compensated. *Rosano*, 754 F.3d at 188.

Ms. Wintjen's claims fail because her deposition testimony establishes that she is unable to offer any specifics regarding how and what tasks she performed, or how much time she spent on those tasks during any given shift, workweek, pay-period, or otherwise. The only exceptions are the two occasions on which she testified that she "washed dishes," and she could only offer a time estimate of 30-45 minutes for the second time she allegedly performed this task.

To start, Ms. Wintjen's speculation that she spent one to two hours per shift on "side work" is insufficient to create a genuine issue of material fact for trial on a claim for which she bears the burden of proof. *See Rosano*, 754 F.3d at 189. Ms. Wintjen does not base her estimate of "one to two hours" per shift solely on her nine weeks of employment with Denny's, Inc., but also on her employment by Know-Betta—a separate employer, with separate employment

20

practices. (Wintjen Dep. 172:1-14.) Notably, Ms. Wintjen worked for Know-Betta for approximately three years, versus the nine weeks at Denny's, Inc. (Brown Dec. at ¶ 6, Ex. A at DENNY'S000015.) No jury could reasonably conclude that Ms. Wintjen's estimate of how much time she spent per shift on side work while working at Denny's is the product of anything other than pure speculation. Absent more, *Rosano* precludes her claims from proceeding to trial.

The Sixth Circuit Court of Appeals's recent decision in *Viet v. Le* further supports judgment in Denny's' favor. 951 F.3d 818 (6th Cir. 2020). As in *Rosano*, the *Viet* plaintiff asserted claims under the FLSA for overtime violations. *Id.* at 822. Like the *Rosano* court, the *Viet* court found that the plaintiff had failed to offer sufficient evidence to defeat the employer's motion for summary judgment. *Id.* at 825. As in this case, the plaintiff offered only an estimate of his weekly schedule, claiming that he "typically worked 60 hours per week." *Id.* at 824. The court concluded this estimate was insufficient because the plaintiff failed to "fill in his general 60-hour estimate with specific facts about his daily schedule," failing to provide "even basic details about his typical day." *Id.* at 824-25. And although acknowledging that an employee need not recall his schedule "with perfect accuracy," the court nevertheless found that an employee must "coherently describe their day-to-day work schedules or the time it takes to complete their duties so that a rational jury could find that they worked more than 40 hours in the weeks claimed." *Id.* at 826 (internal quotations and original formatting omitted). As in *Viet*, Plaintiff has not offered any specific details about her day-to-day work schedule from which a rational jury could conclude that she spent 30% of her time performing non-tip generating work.

The two times Ms. Wintjen alleged she washed dishes (totaling approximately 1-1.5 hours of work) are likewise insufficient for purposes of avoiding summary judgment. Ms. Wintjen was unable to specify what day of the week she performed this task, or even which

month. Instead, the only detail she could offer regarding these two incidents was that they occurred around midnight. But Ms. Wintjen worked 33 hours under non-tipped job codes during night shifts that encompassed the hours between 10 p.m. and 2 a.m. Nine and a half of those hours were logged after her initial training period on October 22 & 23 and November 12 & 13. (Brown Dec., ¶ 8, Ex. C.) As Ms. Wintjen cannot say when she performed the dish-washing she alleges she performed, she cannot establish that these tasks were performed on days for which she was being paid sub-minimum wage. In other words, it is as likely that these incidents occurred on days for which she was paid full minimum wage as it is they were performed on days she received sub-minimum wage. Any finding by a jury one way or the other would be the product of mere speculation.

Last, Ms. Wintjen's own estimates are insufficient to meet her own 30% threshold for "non-tip generating" work, a threshold presumably derived from a 1985 DOL opinion interpreting the dual jobs regulation. *See* U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr. FLSA-854, 1985 WL 1259240 (Dec. 20, 1985) (opining that no tip credit could be claimed for 30-40% of employee's time performing "responsibilities [that] extend to the entire restaurant rather than to the specific area or customers which they serve"). Ms. Wintjen's time records establish that she worked a total of 38 shifts under the "05 – Server" sub-minimum wage job code, for a total of 295.416651 hours. Using her own estimate of one to two hours of side work per shift, Ms. Wintjen estimates that she worked 38 to 76 hours on non-tip generating tasks, or between 12.19% and 25.73% of the total time she worked at Denny's. In either case, her estimate is less than the 30% threshold she alleged in her Complaint.

Even under the so-called 80/20 rule—which Ms. Wintjen does not appear to rely on in her Complaint—her estimate is insufficient. *See Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 881

(8th Cir. 2011) (holding that the dual jobs regulation "places a temporal limit on the amount of related nontipped work an employee can do and still be considered to be performing a tipped occupation" and that "[t]he DOL has used a 20 percent threshold to delineate the line between substantial and nonsubstantial work in various context within the FLSA").[4] Ms. Wintjen's estimate is insufficient because she cannot offer any facts to support application of her high guesstimate, any more than she could offer facts to support her low guesstimate, or any number in between. And indeed the average—1.5 hours—would result in only 19.29%, which is also under the 80/20 rule's threshold. No rational jury could conclude—based on Ms. Wintjen's own testimony—that she spent more than 20% of her time on non-tip generating work without basing such a conclusion on pure, unsupported speculation.

Accordingly, as Ms. Wintjen can offer no evidence to support her claim that Denny's failed to compensate her for non-tip generating work performed in excess of 30%, or the lower threshold of 20%, no genuine issue of material fact exists, and Denny's is entitled to judgment on this claim as a matter of law.

**C.      The Court Should Decline to Exercise Jurisdiction Over Ms. Wintjen's PMWA Claims**

If this Court enters judgment on Ms. Wintjen's FLSA claims, it should decline to exercise jurisdiction over her PMWA claims under 28 U.S.C. § 1367.

Under § 1367, a district court may decline to exercise supplemental jurisdiction where: "'(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3)

---

[4] In November of 2018, the DOL issued U.S. Dep't of Labor, Wage & Hour Div., Op. Ltr. FLSA 2018-27, 2018 WL 5921455 (Nov. 8, 2018), in which the DOL abandoned the 80/20 interpretation of the dual jobs regulation found in its Field Operations Handbook. It is unnecessary to address whether the 2018 letter is entitled to deference for purposes of this motion, or how it affects Ms. Wintjen's claims, as they fail regardless of what threshold is applied. Denny's nevertheless reserves the right to rely upon the DOL's opinion letter in the future, and does not intend to waive any such arguments by not addressing those issues here.

the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.'" *See Bonds v. GMS Mine Repair & Maintenance, Inc.*, No. 2:13-cv-1217, 2015 WL 5602607, at *11 (W.D. Pa. Sept. 23, 2015) (quoting *DeAsencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003).

If the Court grants Denny's summary judgment on Ms. Wintjen's FLSA claims, it will have dismissed all claims over which it had original jurisdiction. (*See* Compl., ¶ 23 (pleading that the court has jurisdiction over PMWA claims under § 1367).) This ground is sufficient reason on its own for the Court to decline to exercise jurisdiction over the state law claims.

Furthermore, like *Bonds*, Ms. Wintjen's PMWA claims raise novel issues of state law under the PMWA. 2015 WL 5602607, at *11. For instance, Ms. Wintjen alleges that to satisfy Pennsylvania law, an employer must make disclosures not required by the FLSA. (Compl. ¶ 57.) Ms. Wintjen likewise alleges that under Pennsylvania law, 43 P.S. 231.34 requires that an employer "notify employees in writing of the hours worked where the Tipped Employee did not receive tips," (Compl. ¶ 63), a requirement not found in the FLSA. Indeed, there are few reported Pennsylvania state court decisions that have even dealt with the tip credit requirements under the PMWA. *See, e.g., Ford v. Lehigh Valley Rest. Grp., Inc.*, No. 14 CV 3227, 2015 WL 13779474, at *9 (Pa. Com. Pl. Apr. 24, 2015) (observing that as of 2015, no Pennsylvania appellate or trial court had construed the term "customarily and regularly receives tips" as used in 43 P.S. § 333.103(d)). Pennsylvania state courts should have the first opportunity to decide these novel questions of whether the PMWA indeed contains additional requirements not found in the FLSA. Therefore, if the Court dismisses the FLSA claims, it should exercise its discretion and dismiss Ms. Wintjen's PMWA claims pursuant to 28 U.S.C. § 1367.

## IV.     CONCLUSION

For the reasons set forth, Denny's respectfully requests: (1) that the Court **GRANT** its

motion for partial summary judgment on Plaintiff's FLSA claims; and (2) **DISMISS** Plaintiff's

PMWA claims without prejudice pursuant to 28 U.S.C. § 1367.

Dated: July 6, 2020                                          Respectfully submitted,

**GRAYDON HEAD & RITCHEY LLP**

*s/ Darren W. Ford*
Kent Wellington (admitted *pro hac vice*)
Michael A. Roberts (admitted *pro hac vice*)
Darren W. Ford (admitted *pro hac vice*)
312 Walnut St., Suite 1800
Cincinnati, OH  45202
Telephone:     (513) 621-6464
Facsimile:     (513) 651-3836
Email:   kwellington@graydon.law
                mroberts@graydon.law
                dford@graydon.law

and

**VORYS, SATER, SEYMOUR AND PEASE LLP**
Mark Zheng (Pa. #313510)
500 Grant Street, Ste. 4900
Pittsburgh, PA  15219
Telephone:  (412) 904-7722
Facsimile:  (412) 904-7800
Email: mczheng@vorys.com

*Attorneys for Defendant Denny's Inc.*

10371773.3